# EXHIBIT   A

| Attorney(s) | Eric H. Jaso, Esq. | Superior Court of |
|---|---|---|
| Office Address | FLEMING RUVOLDT PLLC | New Jersey |
| | 250 MOONACHIE ROAD - SUITE 501 | |
| Town, State, Zip Code | MOONACHIE, NJ 07074 | |
| Telephone Number | (201) 518-7878 | |
| Attorney(s) for Plaintiff | Eric H. Jaso, Esq. | |

Essex COUNTY

Civil DIVISION

Docket No: 7379₁-/16

RONALD SIMS,

Plaintiff(s)

Vs.

MERCEDES-BENZ USA, LLC and DAIMLER AG,

Defendant(s)

**CIVIL ACTION**
**SUMMONS**

From The State of New Jersey To The Defendant(s) Named Above:

The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (The address of each deputy clerk of the Superior Court is provided.) If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $135 and completed Case Information Statement) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services office in the county where you live. A list of these offices is provided. If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A list of these numbers is also provided.

*Michelle M. Smith*
*Clerk of Superior Court*

Dated: 10/26/2016

Jennifer M. Perez,
Acting Clerk of the Superior Court

Name of Defendant to Be Served: DAIMLER AG

Address of Defendant to Be Served: Corporate Headquarters, Mercedesstr. 137, 70327 Stuttgart Germany

NOTE: The Case Information Statement is available at http://www.njcourtsonline.com

Eric H. Jaso
FLEMING RUVOLDT PLLC
2 50 Moonachie Avenue, Suite 501
Moonachie, N.J. 07074
Tel.(201) 518-7878
Fax(201) 518-7879
ejaso@flemingruvoldt.com

| RONALD SIMS,<br><br>Plaintiff,<br><br>vs.<br><br>MERCEDES-BENZ USA, LLC and<br>DAIMLER AG,<br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY<br>ESSEX COUNTY, LAW DIVISION<br><br>Civil Action    7379-16<br><br>Docket No. _____<br><br>COMPLAINT AND JURY DEMAND |
| --- | --- |

Plaintiff Ronald Sims, by way of his complaint against the defendants, says:

**Preliminary Statement**

1.      Mercedes-Benz USA, the American subsidiary of German luxury automobile and

truck manufacturer Daimler, publicly embraces diversity and purports to forbid discrimination

within its workplaces.  On its website, the company claims that it

> defines "Diversity" in a broad and inclusive manner.  MBUSA believes
> Diversity encompasses understanding and valuing the differences that are
> exhibited by all that include, but also go beyond ethnicity, race, gender,
> physical ability, age, sexual orientation, gender identity and/or religion.

> Inclusion for MBUSA is the opportunity for all people to equally and fully
> engage. MBUSA believes an inclusive corporate culture is one in which
> all people feel comfortable and respected regardless of individual
> differences and characteristics.

> MBUSA engages associates at all levels in internal and external diversity
> events and activities, which allow for the introduction of fresh
> perspectives and new ways of thinking. . . .

> MBUSA is committed to recruiting, identifying, developing, retaining and
> promoting people from all backgrounds, experiences and cultures.

BATCH# 860 FILE# 10-26-16
CHECK/RECEIPT# 1505 AMT 250.00

Diversity represents more than just immutable physical characteristics;
Diversity means different ways of thinking.

"Life at MBUSA -- Diversity and Inclusion" (www.mbusa.com/mercedes/about_us/careers)

2.      Plaintiff Ronald Sims brings this action against Defendants under the New Jersey Law Against Discrimination, N.J.S.A. § 10:5-1 *et seq.* ("LAD"), specifically, its prohibitions against discrimination and harassment on the basis of race, nationality, age sexual orientation, for legal relief to redress Defendants' actions in terminating him on a baseless and fabricated pretext, whereas the real reasons for the termination were Plaintiff's race, nationality, age and sexual orientation.

**Parties**

3.      Defendant Mercedes-Benz USA, LLC ("MBUSA"), was, at all relevant times herein, a Delaware Corporation with a principal place of business in Montvale, New Jersey.  As of in or about January 2015, MBUSA relocated its principal place of business to the Atlanta, Georgia area; however, it has continued to maintain offices in Montvale, New Jersey.

4.      Defendant Daimler AG ("Daimler"), was, at all relevant times, herein, a German company with a principal place of business in Stuttgart, Germany.  Through MBUSA and other entities, Daimler does significant business throughout the United States, including in the State of New Jersey, primarily manufacturing, importing, exporting, distributing, marketing, selling, and servicing luxury/performance automobiles and SUVs, as well as commercial trucks.

5.      During all times relevant to this Complaint, Defendants were "employers" of Plaintiff within the definition of the LAD, N.J.S.A. § 10:5-5.

6.      Plaintiff Ronald Sims ("Plaintiff" or "Mr. Sims"), is, and during the times relevant to this lawsuit, was a resident of Newark, New Jersey.  He is an African-American, age 38 (born in June 1978), a native-born U.S. citizen, and an "out" gay man.

Facts Common to All Counts

7.      Mr. Sims obtained a Master's Degree in Manufacturing Management from Penn State. He was an experienced process improvement manager, with several years of corporate experience (primarily with the Eastman Kodak Company), when in or about November 2007, he was contacted by a recruiter for a consulting agency who told him that their client MBUSA was looking for someone with his background in data analysis and improvement projects.

8.      Mr. Sims was hired by the consulting agency, which assigned him to MBUSA in Montvale, New Jersey as a process-improvement consultant.

9.      At MBUSA, Mr. Sims initially worked for the Learning & Performance Department, which managed and organized education and training both for employees working at MBUSA's headquarters and other facilities and for the sales and service staff at MBUSA's over 350 dealers nationwide.  Education and training programs included both in-person and virtual/remote sessions, as well as "e-learning" via computer.  Mr. Sims worked in project management, process improvement, and best practice analysis.

10.      In these roles, he designed and implemented a database for department project management, which standardized the project management process by creating a management dashboard and developing status reporting metrics.  He developed an electronic scheduling tool which enabled dealerships to streamline their scheduling process and provided a measurable productivity report for management.  He streamlined employment data cleanup at all U.S. dealerships, which doubled the accuracy of dealerships' employment histories.  He also created annual budget analyses for employee training using key performance indicators.

11.     In or about early 2011, an MBUSA employee with whom Mr. Sims worked told him about an internal full-time job posting that she thought would be an excellent fit for him.[1] The posting was for a Customer Satisfaction Specialist within the After-Sales Customer Satisfaction Department.

12.     Mr. Sims applied for the position.  Following MBUSA policy, he informed his immediate supervisor, Chris Tedesco, but he did not inform Greg Settle, Tedesco's manager, or Hentrik Hynekamp, the General Manager of the Department, believing that Tedesco would do so.

13.     Because Mr. Sims was one of the finalists, his application was vetted by a Talent Plus, Inc., a third-party human resources consultant to MBUSA, to determine the qualifications and appropriateness of a current employee's transfer to the requested position.

14.     In or about July 2011, Brad Anseth, a Talent Plus consultant, conducted a telephone interview with Mr. Sims, which followed Talent Plus's elaborate matrix for evaluating potential hires.

15.     Mr. Anseth's detailed written evaluation of Mr. Sims for MBUSA was unconditionally positive:

> In summary, Mr. Sims' [*sic*] talent shines when he is called upon to accommodate change.  Highly confident in his ability to see what is possible, he reacts positively to complexity such as changing assingments and deadlines.  His already-intense energy level seems to spike when confronted by a need to adjust to new challenges.  Mr. Sims is intently focused on results, adjusting his plan of attack when new data points him in a different direction. His track record for [*sic*] success, along with his ability to inspire trust, allow him to convince others to adopt his point of view.

---

[1] Where statements, meetings and conversations are described in this Complaint, they are recounted in substance and in part, not verbatim.

16.     On or about August 11, 2011, Mr. Sims was offered the position. He promptly informed Settle, adding that he wanted Settle to be the first to know of his decision to accept the offer. (Indeed, Mr. Sims informed Settle even prior to accepting the offer).

17.     On or about August 15, 2011, Mr. Sims became a full-time, direct employee of MBUSA, working as a metrics/insight specialist within the newly-formed After Sales Customer Satisfaction Department.  As a professional, he was placed within the "D" pay band.  His new supervisor, Ellen Braaf, expressed excitement that he was joining her team.

18.     After he got the job, however, Tedesco told Mr. Sims that he got a lot of heat from Settle and Hynekamp because they hadn't been informed that he had applied for a job in a different department.

19.     Under CEO Stephen Cannon, who had taken over MBUSA in or about 2012, the company shifted its focus toward improving the Mercedes-Benz customer experience.  In or about 2012, MBUSA management formed a stand-alone "Customer Experience Department." Hynekamp was reassigned from the Learning and Performance Department to serve as General Manager of the Customer Experience Department.  Mr. Sims was among the seven MBUSA employees who management hand-picked to start the Department, with three others hired from outside the Company.

20.     Mr. Sims greatly enjoyed working for MBUSA, despite the frequently challenging workload.  He received greater responsibility, at one point being put in charge of calculating and distributing some $500 million in employee bonuses to Mercedes-Benz dealerships across the country.

21.     Mr. Sims always received outstanding reviews from MBUSA management.  He received individual bonus awards for 2011, 2012 and 2013, respectively, at 100%, 105% and

1 1% of target. Michael Dougherty, his immediate supervisor in the Customer Experience Department (his last assignment) praised Mr. Sims when giving him his 2013 review, saying that he was very key to the team, and that they couldn't run the program without him.

22.     After several years working in these different positions, with an expanding job portfolio, Mr. Sims believed that MBUSA was the company where he would spend his career, and from which he would someday retire.

23.     In or about April 2014, Mr. Sims applied for another position at MBUSA. MBUSA had built a factory in Alabama.   MBUSA planned to turn a factory visitor center into a facility where all 26,000 MBUSA employees (including its dealership employees) would undergo what the company dubbed the "Brand Immersion Experience," an intensive, in-person program to educate and train workers in the Mercedes-Benz brand, history and culture.  The position was to help manage this "Mercedes University" program.

24.     Given Mr. Sims's years of experience in MBUSA's employee training and customer satisfaction areas, as well as his ability and willingness to move to Alabama, he believed that he would be an excellent candidate for the managerial position.

25.     To avoid the concerns that arose the last time he applied for a different job, Mr. Sims duly informed both his immediate supervisor (Michael Dougherty) and Hynekamp.

26.     Mr. Sims submitted his application and was selected for an interview, which entailed analyzing a business case study and preparing and giving a PowerPoint presentation. Mr. Sims interviewed with Settle and Christine Lohrfink, a Learning Manager who was appointed Program Lead.  They communicated how impressed they were with Mr. Sims's analysis and presentation.

27.     Based on the interview, Mr. Sims was asked to interview again with a Talent Plus representative, which he understood to mean he was probably among the top two or three candidates.  That interview likewise went very well.  Mr. Sims fully expected that he would get the Alabama job.

28.     On August 15, 2014, Mr. Sims got a call from Hynekamp asking him to report to a conference room in the Human Resources Department.  He was excited to receive the call, since he thought that Hynekamp and HR were going to tell him he had gotten the Alabama job, and went quickly downstairs to the conference room.

29.     The reception Mr. Sims got was far from welcoming.  Instead, he found himself blindsided -- accused of a crime, fired, and immediately escorted from the building.

*Sims is Terminated on a Pretext*

30.     MBUSA terminated Mr. Sims from employment pretextually, and with utterly no basis or reason, other than his race, nationality, age and/or sexual orientation.  Management accused him of having purloined a $2.50 breakfast from the company cafeteria.

31.     During Mr. Sims's employment, he learned (and observed) the well-known "company secret" that both Daimler A.G. and MBUSA favor the employment and promotion of Germans to the prejudice of U.S. citizens and residents, particularly racial minorities.

32.     Mr. Sims also observed that gays and lesbians are also generally frowned upon, so employees with those sexual orientations usually remain "in the closet" at work.

33.     Indeed, Mr. Sims kept his sexual orientation a secret from his co-workers until only about four months before he was terminated.  However, when he "came out" to them (and within MBUSA more generally) he quickly became active in diversity initiatives and activities

within the Company.   Among other things, he joined the Diversity Team, which hosted a lecture by a high-ranking gay American Express executive at MBUSA headquarters.

34.     In 2012, there were approximately 14 employees in the Customer Experience Department, including Dianne Quinn, who was a "Specialist" of equal rank to Mr. Sims.

35.     In or about July 2012, Maximilian Klube ("Klube"), a white, 22-year-old German-born citizen, who Mr. Sims and his co-workers understood to be heterosexual, was assigned to the Department as a coordinator, essentially serving as an assistant.  Hynekamp, the General Manager of the Department, had personally promoted Klube, who MBUSA originally hired as an intern in or about November 2011, to a salaried employee.

36.     As a coordinator, and "B" pay band employee, Klube was [younger and] junior in seniority to everyone else in the Department.  Nonetheless, Klube was directly "mentored" by high-level German MBUSA executives during the entire time he worked in the Department.

37.     On or about August 14, 2014, Quinn, Klube and Mr. Sims were traveling back to New Jersey from a department field trip to visit the Vehicle Preparation Center and Product Distribution Center in Baltimore, Maryland.  They discussed career growth at MBUSA and opportunities in general.  Klube was complaining that he was frustrated because he had more expenses than he could afford being in Bergen County, and that he was not getting paid enough in his role.

38.     Klube said that he had spoken to Hynekamp about a promotion and increase in salary.  Klube stated that the MBUSA Human Resources Department previously informed him that he did not yet have sufficient experience and seniority to receive a salary-band increase.  Klube also told them that he had applied for a better position at the company showroom in Manhattan.

39.     Quinn and Mr. Sims told Klube that he needed to be patient, because MBUSA has

a culture where employees need to develop a minimum number of years of work experience

before they are promoted or given an increase to a higher wage level.  Indeed, MBUSA has a

rule requiring 18 months of tenure in a current job before being eligible to apply for another job

within the company, even at the same pay level.

40.     Klube told Quinn and Mr. Sims that Hynekamp had assured him not to worry,

because something was coming his way soon.

41.     As noted, MBUSA management falsely and pretextually accused Mr. Sims of

stealing food from the company cafeteria.

42.     The MBUSA cafeteria in Montvale had a typical arrangement, with manned

short-order stations for grilled foods, pizza, and other hot dishes, and unmanned areas such as the

hot cereal/soup station, the salad bar, the soda fountains and refrigerated cases offering pre-

prepared sandwiches and other foods, packaged beverages, and other items.  Two cashiers were

centrally located between the cafeteria section and the seating area, although usually only one

was on duty during breakfast hours.

43.     Mr. Sims's usual practice was to order a particular dish that required preparation

and then go to the cash register with items that did not require preparation, pay for all of the

items (including the dish being prepared), then return to the short-order station to pick up the

prepared dish.  This saved time waiting in multiple lines for the short-order station and then the

cashier.

44.     Many of Mr. Sims's fellow employees followed the same practice at the cafeteria.

His Department colleague Jennifer Harmon, a white woman, would usually accompany him to

get breakfast to take back to their desks, and she likewise ordered her food first, paid for it, then picked the food up when it was ready.

45.     On August 15, 2015, Mr. Sims and Ms. Harmon went to the cafeteria as usual to get breakfast.  As usual, they both ordered their food (Mr. Sims ordered sausage from the grill and served himself oatmeal) and paid the cashier before picking up their made-to-order dishes and departing the cafeteria.  Mr. Sims paid cash for his food.  The cashier (as was her usual practice) did not offer a receipt nor did Mr. Sims ask for one.  On previous occasions, Mr. Sims had observed that because few people ever asked for a receipt, usually the cash register tape simply fed directly into an adjacent wastebasket.

46.     Later that day, Hynekamp asked Mr. Sims to come to a conference room in the human resources department.  When Mr. Sims arrived, he found Hynekamp with Jennifer Ahrens, an MBUSA Human Resources executive.

47.     Ahrens informed Mr. Sims that he was being terminated because he had left the cafeteria without paying for oatmeal and sausage.

48.     Shocked, Mr. Sims told Ahrens that he had paid for the food.  Ahrens demanded that he produce a receipt.  However, as described, Mr. Sims had paid cash and had not taken a receipt, as usual.

49.     Ahrens then said that there had been additional incidents involving Mr. Sims not paying for items at the cafeteria, and she claimed that management had statements from witnesses to support those allegations.

50.     Struggling to make sense of this accusation, Mr. Sims recalled (to himself) that about a month earlier, a cashier had accused Mr. Sims of taking a large bottle of "Smart Water" without paying for it.  However, he explained at the time that he had purchased a case of the

bottles at Costco and brought it to the office, and indeed had already consumed part of the bottle that he had brought to the cafeteria. (Indeed, after Mr. Sims brought his own beverage supply to the office, several of his colleagues started to do the same thing, but upon information and belief, none of them ever was accused of stealing beverages from the cafeteria). The cashier never mentioned the incident again, and had not accused him of anything that morning.

51.     Mr. Sims continued to profess his astonishment, and assured Ahrens and Hynekamp that he was an ethical person who would never steal from the company, especially one where he hoped to work until retirement. At one point, Ahrens turned to Hynekamp and suggested that perhaps the company could suspend rather than terminate Mr. Sims until they could look into the matter further. Hynekamp was unmoved and said nothing.

52.     Ahrens told Mr. Sims that he would get paid for that day, but get no other severance, and that he could apply for unemployment.

53.     Mr. Sims then asked to talk privately to Hynekamp. He again insisted that he would never steal. Hynekamp said there was nothing he could do, and asked for his blackberry and key to the company car. He then said that a car service would take him home, and that his personal belongings would be returned to him later.

54.     MBUSA thus deprived Mr. Sims of his career and his reputation summarily, accusing him of committing a crime yet with no proper investigation, no hearing, no opportunity to confront his accusers.

55.     Less than five months before Mr. Sims was terminated, his individual bonus performance was rated at 115% of target.

56.     The same day that Mr. Sims was terminated and escorted from the building by MBUSA security, Hynekamp called a departmental meeting to inform Mr. Sims's co-coworkers

that he was no longer with the company. He provided no explanation or reason for Sims's departure.

57.     Almost immediately after his termination, Mr. Sims's position was posted on the internal MBUSA website as open. Several employees applied for the job, and a number were interviewed.

58.     Though the other candidates, upon information and belief, had more experience and better substantive qualifications, Klube – a 22-year-old, white, German heterosexual -- got Mr. Sims's job, as Hynekamp had evidently promised him. Even though according to Klube's own telling, MBUSA HR had informed him that he could not yet be promoted, his new position was *two* pay bands higher than his prior grade (though MBUSA ended up promoting him only one pay grade).

59.     Mr. Sims learned – both during his time at MBUSA and after being terminated -- that no African-American has ever worked for MBUSA long enough to retire from the company. As of when Mr. Sims was terminated, no African-American had ever been promoted to an L3 position. Most African-Americans who worked for MBUSA were in the lowest paid wage bands A and B. Also, there is only a miniscule number of African-Americans who work in wage bands higher than A and B.

## COUNT ONE – RACE DISCRIMINATION IN VIOLATION OF NEW JERSEY LAW AGAINST DISCRIMINATION

60.     The preceding paragraphs 1 through 59 are hereby incorporated as if repeated herein.

61.     By and through their course of conduct as alleged herein, Defendants discriminated against the Plaintiff by terminating him on the basis of his race in violation of the LAD.

Page 12 of 17

62.     Defendants' wrongful conduct was intentional, deliberate, willful, and undertaken in utter disregard for Plaintiff's rights.

63.     Defendants had no legitimate, nondiscriminatory reason for terminating Plaintiff. Defendants furthermore intentionally terminated Plaintiff, on a pretext, for the express purpose of promoting a white person – who was demonstrably inexperienced and unqualified -- to take over Plaintiff's job.  That promotion also violated Defendants' internal employment policies and practices.

64.     As a direct and proximate result of Defendants' illegal discrimination, Plaintiff has suffered and will continue to suffer severe harm, and is entitled to all legal and equitable remedies available under the LAD, including back pay, front pay, reinstatement, restoration of benefits and seniority, and compensatory and punitive damages, in amounts to be determined at trial.

65.     Plaintiff is furthermore entitled to an award of reasonable attorneys' fees, costs and expenses, as provided by statute.

## COUNT TWO – NATIONALITY DISCRIMINATION IN VIOLATION OF NEW JERSEY LAW AGAINST DISCRIMINATION

66.     The preceding paragraphs 1 through 59 are hereby incorporated as if repeated herein.

67.     By and through their course of conduct as alleged herein, Defendants discriminated against the Plaintiff by terminating him on the basis of his United States nationality in violation of the LAD.

68.     Defendants' wrongful conduct was intentional, deliberate, willful, and undertaken in utter disregard for Plaintiff's rights.

69.     Defendants had no legitimate, nondiscriminatory reason for terminating Plaintiff. Defendants furthermore intentionally terminated Plaintiff, on a pretext, for the express purpose of promoting a German national – who was demonstrably inexperienced and unqualified -- to take over Plaintiff's job.  That promotion also violated Defendants' internal employment policies and practices.

70.     As a direct and proximate result of Defendants' illegal discrimination, Plaintiff has suffered and will continue to suffer severe harm, and is entitled to all legal and equitable remedies available under the LAD, including back pay, front pay, reinstatement, restoration of benefits and seniority, and compensatory and punitive damages, in amounts to be determined at trial.

71.     Plaintiff is furthermore entitled to an award of reasonable attorneys' fees, costs and expenses, as provided by statute.

## COUNT THREE – AGE DISCRIMINATION
## IN VIOLATION OF NEW JERSEY LAW AGAINST DISCRIMINATION

72.     The preceding paragraphs 1 through 59 are hereby incorporated as if repeated herein.

73.     By and through their course of conduct as alleged herein, Defendants discriminated against the Plaintiff by terminating him on the basis of his sexual orientation in violation of the LAD.

74.     Defendants' wrongful conduct was intentional, deliberate, willful, and undertaken in utter disregard for Plaintiff's rights.

75.     Defendants had no legitimate, nondiscriminatory reason for terminating Plaintiff. Defendants furthermore intentionally terminated Plaintiff, on a pretext, for the express purpose of promoting a 22-year-old person – who was demonstrably inexperienced and unqualified -- to

take over Plaintiff's job.  That promotion also violated Defendants' internal employment policies and practices.

76.     As a direct and proximate result of Defendants' illegal discrimination, Plaintiff has suffered and will continue to suffer severe harm, and is entitled to all legal and equitable remedies available under the LAD, including back pay, front pay, reinstatement, restoration of benefits and seniority, and compensatory and punitive damages, in amounts to be determined at trial.

77.     Plaintiff is furthermore entitled to an award of reasonable attorneys' fees, costs and expenses, as provided by statute.

**COUNT FOUR – SEXUAL ORIENTATION DISCRIMINATION
IN VIOLATION OF NEW JERSEY LAW AGAINST DISCRIMINATION**

78.     The preceding paragraphs 1 through 59 are hereby incorporated as if repeated herein.

79.     By and through their course of conduct as alleged herein, Defendants discriminated against the Plaintiff by terminating him on the basis of his sexual orientation in violation of the LAD.

80.     Defendants' wrongful conduct was intentional, deliberate, willful, and undertaken in utter disregard for Plaintiff's rights.

81.     Defendants had no legitimate, nondiscriminatory reason for terminating Plaintiff. Defendants furthermore intentionally terminated Plaintiff, on a pretext, for the express purpose of promoting a heterosexual person – who was demonstrably inexperienced and unqualified -- to take over Plaintiff's job.  That promotion also violated Defendants' internal employment policies and practices.

Page **15** of 17

82.     As a direct and proximate result of Defendants' illegal discrimination, Plaintiff has suffered and will continue to suffer severe harm, and is entitled to all legal and equitable remedies available under the LAD, including back pay, front pay, reinstatement, restoration of benefits and seniority, and compensatory and punitive damages, in amounts to be determined at trial.

83.     Plaintiff is furthermore entitled to an award of reasonable attorneys' fees, costs and expenses, as provided by statute.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays the Court to grant the following relief:

A. Issue a declaratory judgment that the employment policies, practices, procedures, conditions, and customs of Defendants violated Plaintiff's civil rights of Plaintiff under the LAD;

B. Grant Plaintiff a permanent injunction enjoining Defendants, its officers, successors, assigns, and all persons in active concert or participation with it, from continuing to violate the LAD;

C. Order Defendants to institute and carry out policies, practices, and programs which provide equal employment opportunities which eradicate the effects of Defendants' past and present unlawful employment practices;

D. Order Defendants to make Plaintiff whole for their unlawful employment practices, by providing appropriate back-pay and front pay with prejudgment interest, in amounts to be determined at trial, reinstatement, restoration of benefits and seniority, and other affirmative relief necessary to eradicate the effects of Defendants' unlawful employment practices;

E. Order Defendants to make Plaintiff whole for the unlawful employment practices described above by providing compensation for non-pecuniary losses, including pain, suffering and humiliation in amounts to be determined at trial;

F. An award of litigation costs and expenses, including reasonable attorneys' fees, to the Plaintiff; and

G. Grant such further relief as the Court deems necessary and proper.

## JURY TRIAL DEMAND

Plaintiff demands trial by jury of all issues triable to a jury as of right.

FLEMING RUVOLDT PLLC

By: _____

Eric H. Jaso
250 Moonachie Road
Suite 501
Moonachie, NJ 07074
Telephone: (201) 518-7878
Facsimile: (201) 518-7879

*Attorneys for Plaintiff*

Of counsel
(pending motion for admission *pro hac vice*):
Martin R. Lee, Esq.
Warshaw Burstein Cohen Schlesinger & Kuh, LLP
555 Fifth Avenue
New York, NY 10017
Tel.: (212) 984-7868
Fax: (212) 972-9150

Dated:  October 26, 2016
        Moonachie, New Jersey

Appendix XII-B1



# CIVIL CASE INFORMATION STATEMENT
## (CIS)

Use for initial Law Division
Civil Part pleadings (not motions) under *Rule* 4:5-1
**Pleading will be rejected for filing, under *Rule* 1:5-6(c),
if information above the black bar is not completed
or attorney's signature is not affixed**

| FOR USE BY CLERK'S OFFICE ONLY |
| --- |
| PAYMENT TYPE: ☐ CK ☐ CG ☐ CA |
| CHG/CK NO. |
| AMOUNT: |
| OVERPAYMENT: |
| BATCH NUMBER: |

| 1. ATTORNEY / PRO SE NAME | 2. TELEPHONE NUMBER | 3. COUNTY OF VENUE |
| --- | --- | --- |
| Eric H. Jaso, Esq. | 201-518-7878 | Essex |

| 4. FIRM NAME (if applicable) | 5. DOCKET NUMBER (when available) |
| --- | --- |
| FLEMING RUVOLDT PLLC | 7379-10 |

| 6. OFFICE ADDRESS | 7. DOCUMENT TYPE |
| --- | --- |
| 250 MOONACHIE ROAD - SUITE 501 MOONACHIE, NJ 07074 | COMPLAINT |
| | 8. JURY DEMAND   ■ Yes   ☐ No |

| 9. NAME OF PARTY (e.g., John Doe, Plaintiff) | 10. CAPTION |
| --- | --- |
| RONALD SIMS, Plaintiff | RONALD SIMS, Plaintiff v. MERCEDES-BENZ USA, LLC and DAIMLER AG, Defendants |

| 11. CASE TYPE NUMBER (See reverse side for listing) | 12. HURRICANE SANDY RELATED? | 13. IS THIS A PROFESSIONAL MALPRACTICE CASE?   ☐ YES   ■ NO |
| --- | --- | --- |
| 618 | ☐ YES   ■ NO | IF YOU HAVE CHECKED "YES," SEE *N.J.S.A.* 2A:53 A -27 AND APPLICABLE CASE LAW REGARDING YOUR OBLIGATION TO FILE AN AFFIDAVIT OF MERIT. |

| 14. RELATED CASES PENDING? | 15. IF YES, LIST DOCKET NUMBERS |
| --- | --- |
| ☐ Yes   ■ No | |

| 16. DO YOU ANTICIPATE ADDING ANY PARTIES (arising out of same transaction or occurrence)? | 17. NAME OF DEFENDANT'S PRIMARY INSURANCE COMPANY (if known) |
| --- | --- |
| ☐ Yes   ■ No | ☐ NONE   ☐ UNKNOWN |

**THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE.**

CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

| 18. DO PARTIES HAVE A CURRENT, PAST OR RECURRENT RELATIONSHIP? | IF YES, IS THAT RELATIONSHIP: |
| --- | --- |
| ■ Yes   ☐ No | ■ EMPLOYER/EMPLOYEE   ☐ FRIEND/NEIGHBOR   ☐ OTHER (explain) <br> ☐ FAMILIAL   ☐ BUSINESS |

| 19. DOES THE STATUTE GOVERNING THIS CASE PROVIDE FOR PAYMENT OF FEES BY THE LOSING PARTY?   ■ YES   ☐ No |
| --- |

20. USE THIS SPACE TO ALERT THE COURT TO ANY SPECIAL CASE CHARACTERISTICS THAT MAY WARRANT INDIVIDUAL MANAGEMENT OR ACCELERATED DISPOSITION

| 21. DO YOU OR YOUR CLIENT NEED ANY DISABILITY ACCOMMODATIONS? | IF YES, PLEASE IDENTIFY THE REQUESTED ACCOMMODATION |
| --- | --- |
| ☐ Yes   ■ No | |
| 22. WILL AN INTERPRETER BE NEEDED? | IF YES, FOR WHAT LANGUAGE? |
| ☐ Yes   ■ No | |

23. I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b).

24. ATTORNEY SIGNATURE:



CIVIL CASE INFORMATION STATEMENT
(CIS)
Use for initial pleadings (not motions) under Rule 4:5-1

**CASE TYPES** (Choose one and enter number of case type in appropriate space on the reverse side.)

**Track I  -  150 days' discovery**
151   NAME CHANGE
175   FORFEITURE
302   TENANCY
399   REAL PROPERTY (other than Tenancy, Contract, Condemnation, Complex Commercial or Construction)
502   BOOK ACCOUNT (debt collection matters only)
505   OTHER INSURANCE CLAIM (including declaratory judgment actions)
506   PIP COVERAGE
510   UM or UIM CLAIM (coverage issues only)
511   ACTION ON NEGOTIABLE INSTRUMENT
512   LEMON LAW
801   SUMMARY ACTION
802   OPEN PUBLIC RECORDS ACT (summary action)
999   OTHER (briefly describe nature of action)

**Track II  -  300 days' discovery**
305   CONSTRUCTION
509   EMPLOYMENT (other than CEPA or LAD)
599   CONTRACT/COMMERCIAL TRANSACTION
603N AUTO NEGLIGENCE – PERSONAL INJURY (non-verbal threshold)
603Y AUTO NEGLIGENCE – PERSONAL INJURY (verbal threshold)
605   PERSONAL INJURY
610   AUTO NEGLIGENCE – PROPERTY DAMAGE
621   UM or UIM CLAIM (includes bodily injury)
699   TORT – OTHER

**Track III  -  450 days' discovery**
005   CIVIL RIGHTS
301   CONDEMNATION
602   ASSAULT AND BATTERY
604   MEDICAL MALPRACTICE
606   PRODUCT LIABILITY
607   PROFESSIONAL MALPRACTICE
608   TOXIC TORT
609   DEFAMATION
616   WHISTLEBLOWER / CONSCIENTIOUS EMPLOYEE PROTECTION ACT (CEPA) CASES
617   INVERSE CONDEMNATION
618   LAW AGAINST DISCRIMINATION (LAD) CASES

**Track IV  -  Active Case Management by Individual Judge / 450 days' discovery**
156   ENVIRONMENTAL/ENVIRONMENTAL COVERAGE LITIGATION
303   MT. LAUREL
508   COMPLEX COMMERCIAL
513   COMPLEX CONSTRUCTION
514   INSURANCE FRAUD
620   FALSE CLAIMS ACT
701   ACTIONS IN LIEU OF PREROGATIVE WRITS

**Multicounty Litigation (Track IV)**
271   ACCUTANE/ISOTRETINOIN
274   RISPERDAL/SEROQUEL/ZYPREXA
281   BRISTOL-MYERS SQUIBB ENVIRONMENTAL
282   FOSAMAX
285   STRYKER TRIDENT HIP IMPLANTS
286   LEVAQUIN
287   YAZ/YASMIN/OCELLA
289   REGLAN
290   POMPTON LAKES ENVIRONMENTAL LITIGATION
291   PELVIC MESH/GYNECARE
292   PELVIC MESH/BARD
293   DEPUY ASR HIP IMPLANT LITIGATION
295   ALLODERM REGENERATIVE TISSUE MATRIX
296   STRYKER REJUVENATE/ABG II MODULAR HIP STEM COMPONENTS
297   MIRENA CONTRACEPTIVE DEVICE
299   OLMESARTAN MEDOXOMIL MEDICATIONS/BENICAR
300   TALC-BASED BODY POWDERS
601   ASBESTOS
623   PROPECIA

If you believe this case requires a track other than that provided above, please indicate the reason on Side 1,
in the space under "Case Characteristics.

Please check off each applicable category   ☐ **Putative Class Action**      ☐ **Title 59**